676

Kurt SAXON, doing business as Atlan
Formularies, Appellant,

v.

Bill BLANN; Judy Blann, doing business
as Delta Press, Ltd, doing business as
Desert Publications; Frank H. Park,
doing business as Democrat Printing
and Lithographing Co., Inc, an Arkan-
sas Corporation; Lawrence P. Harper;
John Doe, 1–25; Delta Press, Ltd, a
Louisiana Corp.; Democrat Printing
and Lithographing Co., an Arkansas
Corp., Appellees.

Kurt SAXON, doing business as
Atlan Formularies, Appellee,

v.

Bill BLANN; Judy Blann, doing business
as Delta Press, Ltd, doing business as
Desert Publications, Appellants.

Frank H. Park, doing business as Demo-
crat Printing and Lithographing Co.,
Inc, an Arkansas Corporation; Law-
rence P. Harper; John Doe, 1–25, De-
fendants.

Delta Press, Ltd, a Louisiana
Corp., Appellee.

Democrat Printing and Lithographing
Co., an Arkansas Corp.,
Defendant.

Nos. 91–2461, 91–2463.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1992.
Decided July 1, 1992.

Kenneth D. Sisco, Santa Ana, Cal., argued, for appellant.

William I. Prewett, El Dorado, Ark., argued, for Judy Blann.

Diane S. Mackey, Little Rock, Ark., argued, for Democrat Printing and Lawrence P. Harper.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

## I. INTRODUCTION

Kurt Saxon has authored numerous books on survivalism and weaponry. He brought this action for copyright infringement, under 17 U.S.C. § 501 (1988), breach of contract and fraud against one of his distributors, Bill and Judy Blann [hereinafter referred to as Blann], and his publisher, Democrat Printing and Lithographing Co., Inc (DP & L), and DP & L sales representative, Lawrence P. Harper. After a bench trial, the district court[1] found that Blann had violated one of Saxon's copyrights, and awarded Saxon $19,843.45 in damages attributable to Blann's profits from their infringement. The district court rejected the remainder of Saxon's claims, and found for Harper on his counterclaim against Saxon for $9,000. Saxon appeals the district court's judgment, arguing: (1) the district court erred in its findings regarding his other infringement and state law claims; (2) the district court erred in finding that Saxon had forfeited several of his copyrights. The Blanns cross-appeal, arguing: (1) the district court erred in finding that Saxon had retained the copyright they had allegedly infringed and (2) the district court erred in calculating the profits they had earned attributable to their alleged infringement. We affirm.

## II. BACKGROUND

Since 1972, Kurt Saxon (doing business as Atlan Formularies) has published a number of paperback books containing previously published material interspersed with original material by Saxon. The books discuss survivalism and weaponry. Saxon obtained a "certificate-registration of a claim to copyright" dated May 15, 1972 for *The Poor Man's James Bond* [books in this series will be referred to as *PMJB*]. On February 28, 1989, certificates of copyright registration were issued for the following books: *The New Improved Poor Man's James Bond (NIJB); The Survivor*, volume 1; *The Survivor*, volume 2; *Grand-*

---

dad's *Wonderful Book of Chemistry;* *PMJB* 2 and *PMJB* 3.

DP & L has printed all of the above books for Saxon except the original *PMJB*. Saxon authorized DP & L to give several thousand copies of his books to one of his distributors, Bill and Judy Blann (doing business as Delta Press and Desert Publications), between 1986 and 1988. At trial, Saxon alleged that DP & L distributed more copies of his books than the numbers he had authorized. Saxon claims that DP & L had printed 30,000 copies for six of his books (5,000 copies per title) because DP & L had billed him for 30,000 copies, and then distributed many of them without his authorization. DP & L computer records indicated that roughly 15,000 books had actually been printed, which closely matched the number of books Saxon authorized for distribution by Blann.

In 1987, Saxon encountered financial problems and needed money to pay DP & L to print more books. On March 5, 1987, Saxon entered into a loan agreement with Blann, who would pay $15,000 of his DP & L printing costs. Saxon memorialized the agreement with a letter he wrote to Bill Blann on that date:

> Here is an agreement which I think will satisfy you. You are to pay The Democrat–Lithograph Printing Co. $15,-000.00 and I will pay the remainder.

> Thirty days after delivery of 1,000 copies of THE POOR MAN'S JAMES BOND Vol. 1 I will begin paying you a total of $18,000.00. If, at the end of 90 days after delivery, I have not paid the full amount, the rights of ownership of THE POOR MAN'S JAMES BOND Vol. 1 plus negatives and layouts will belong to you.

> As further security, 3,000 copies of the book will be held at the printing company until you release them to me.

> As I pay you, you will release copies to me at the rate of $6.00 each, as $18,-000.00 divided by 3,000 amounts to $6.00 each.

> After printing, you will take 1,000.00 copies at $5.00 each to apply to my previous debt. You will then send me 1,000 copies of THE POOR MAN'S JAMES BOND Vol. 2, as previously agreed upon, leaving you with 1,500 copies as security for for [sic] the previous loan.

> It is understood that the printing company will keep the negatives to both books until you release them to me after the debts on them have been paid.

> Concerning the remaining $6,100.00 and some odd dollars, I will pay that in cash or stock trade in more copies of THE POOR MAN'S JAMES BOND 2 or THE WEAPONEER, at the rate of $5.00 per copy.

Unable to re-pay Blann, Saxon made the following notation on the bottom of the letter several months later: "Due to inability to meet my part of the terms of the agreement the Poor Man's James Bond Vol. 1 is now the property of Bill Blann of Delta. 7-7-87. Kurt Saxon." Saxon mailed the negatives of *PMJB* 1 to Blann. Blann subsequently published an edition of *PMJB* 1 without a copyright notice, thus releasing it to the public domain. Saxon published *NIJB* shortly afterwards to undermine the commercial value of *PMJB* 1 to Blann. *NIJB* contained the same contents as *PMJB* 1, except for twenty-six pages of new material added by Saxon.

Saxon claimed at trial that Blann, DP & L and Harper infringed his copyrights by: (1) reproducing and distributing a large number of his books without his authorization, and (2) publishing *PMJB* 1 without a copyright notice.

The district court found that Saxon forfeited his copyrights to *The Survivor*, volume 1, *The Survivor*, volume 2, and *PMJB* 2 because more than one year had lapsed between the actual distribution of those books and the dates of the copyright notices contained in them. 17 U.S.C. § 406(b) (1988). The district court also found that Saxon could not enforce his copyright of *NIJB* because of his unclean hands in publishing the book in order to destroy the commercial value of *PMJB* 1 to Blann. Thus, Saxon possessed valid copyrights of *Granddad's Wonderful Book of Chemistry* (11–inch by 14–inch version), *Granddad's Wonderful Book of Chemistry* (8½–

inch by 11–inch version), *PMJB* 1 and *PMJB* 3.

The district court found that Saxon had retained his copyright to *PMJB* 1 when he transferred its "ownership rights" to Blann, that Blann had infringed Saxon's copyright by publishing *PMJB* 1 without a copyright notice, and that Saxon had incurred $19,843.45 in damages as a result. The district court rejected Saxon's other claims of unauthorized distribution, because it found that DP & L's computer records were the best evidence of how many copies DP & L had printed.

Saxon claimed that Blann breached the March 5, 1987 contract by retaining the 2,800 copies of *PMJB* 1 that Blann had held as security for his $15,000 loan to Saxon. Saxon argued that under the agreement, Blann would only retain the *PMJB* 1 copies if, upon non-payment, Saxon had failed to transfer his rights in *PMJB* 1 to Blann. The district court rejected Saxon's claim because nothing in the contract provided for Blann to return the books in the event of a non-payment. Saxon also alleged that Blann and DP & L conspired to defraud him by inducing him to enter into the March 5, 1987 contract, and then preventing him from enforcing his end of the contract by hindering distribution of his books. The district court found no clear and convincing evidence of fraud by Blann or by DP & L, and rejected those claims.

DP & L charged its salespeople for any debts more than 120 days old owed by any of their accounts. Because Saxon had failed to pay DP & L $9,000 in printing costs, DP & L charged salesman Lawrence Harper, who handled Saxon's account, for that amount. Harper counterclaimed against Saxon for the $9,000, and the district court found for Harper because Saxon did not dispute the debt at trial.

## III. DISCUSSION

### A. *Disqualification*

Saxon argues that Judge Waters should have disqualified himself from the proceedings. Saxon moved, after trial, to disqualify Judge Waters, based on Saxon's assertion that a number of survivalists, who possessed Saxon's books, had been accused in a criminal trial in Arkansas of conspiring to bomb Judge Waters's home. Judge Waters denied the disqualification motion, stating that he never knew that the people who had allegedly threatened him had any connection to Saxon. We need not consider the district court's findings on this matter, because Saxon failed to comply with 28 U.S.C. § 144 (1988). Saxon did not file an affidavit stating the facts and reasons for recusing Judge Waters ten days before the trial began, and also failed to show good cause for not doing so. *See id.* Therefore, we reject Saxon's appeal on this issue.

### B. *Factual Findings*

Saxon makes a number of challenges to the district court's factual findings. Saxon disputes the district court's findings that:

1. DP & L had not printed and distributed more books than Saxon had authorized.

2. Blann did not breach the March 5, 1987 agreement between Blann and Saxon by retaining 3,000 copies of *PMJB* 2 when Saxon failed to pay back the money Blann loaned Saxon.

3. Blann and DP & L did not conspire to defraud Saxon.

4. Saxon owed Lawrence Harper $9,000 for failing to pay DP & L for the costs of printing his books.

5. No fiduciary relationship existed between Saxon and DP & L and Harper.

Saxon's challenges to the above findings pertained to issues where the parties presented conflicting evidence and testimony. After reviewing the record, we are satisfied that the district court did not clearly err in its findings on these matters. Fed.R.Civ.P. 52.

### C. *Forfeiture*

Saxon appeals the district court's findings that he forfeited his copyrights to *PMJB* 2 and *The Survivor*, volumes 1 and 2. The district court found that more than a year had lapsed between the actual distri-

bution of those works and the date of the copyright notices attached to those publications, and therefore Saxon had forfeited those copyrights under 17 U.S.C. §§ 405(a), 406(b) (1988).[2] Several weeks after the district court rendered its opinion, Saxon moved for relief from the judgment due to newly discovered evidence under Rule 60(b). Saxon presented evidence that *PMJB* 2 had been published in 1986, with a copyright notice of 1986, instead of a notice of 1988, as found by the district court. Saxon also presented evidence that *The Survivor*, volumes 1 and 2, had been previously copyrighted. The district court refused to consider this evidence because Saxon presented no excuse for why he did not present this proof at trial. Saxon argues that the district court erred in denying his motion because the evidence he presented was vital to the forfeiture issue.

We review denials of Rule 60(b) motions only for abuses of discretion. *In re Design Classics, Inc.*, 788 F.2d 1384, 1386 (8th Cir.1986). Under Rule 60(b), a trial court may only consider new evidence presented after the trial "which by due diligence could not have been discovered in time to move for a new trial." Saxon had every opportunity to present the copyright certificates and the cover of *PMJB* 2 at trial, and did not do so. The district court acted within its discretion in denying Saxon's motion.

■ The district court held that Saxon could not enforce his copyright of *NIJB* due to unclean hands. The defense of unclean hands will bar enforcement of a valid copyright when a plaintiff commits wrongdoing "of serious proportions." 3 Melville B. Nimmer, *Copyright*, § 13.09[B] at 13–148–49 (1991). The defense does not apply "where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts" affect the equitable relations between the parties with respect to

the controversy. *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). Saxon admitted at trial that, after he had transferred the publishing rights of *PMJB* 1 to Blann, he slightly revised the book and published it as *NIJB* in order to take business away from Blann. The district court found that Saxon acted with the "requisite scienter" to deny the enforcement of the *NIJB* copyright on the basis of the unclean hands defense. Saxon argues that his actions were not serious enough to bar him from enforcing the copyright of *NIJB*. We disagree. Saxon's actions may have damaged Blann's interests, and were directly related to the equities between the parties. The district court did not err in finding that Saxon's conduct barred him from enforcing his copyright of *NIJB*.

### D. *Blann's Cross–Appeal*

■ The Blanns argue, as part of their cross-appeal, that the district court erred in finding that Saxon had not transferred the copyright of *PMJB* 1 to them, when Saxon gave Blann the "ownership rights" to *PMJB* 1. The Blanns contend that Saxon intended on transferring all of his rights to *PMJB* 1 to Blann. We disagree. Section 202 of the Copyright Act provides that "[o]wnership of a copyright ... is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202 (1988). Thus, the conveyance of "ownership rights" to a book will not convey the copyright of the book. To transfer ownership of a copyright, the parties must state in writing that they intend to transfer a copyright. 17 U.S.C. § 204(a) (1988). Saxon did not do this, and therefore did not transfer the copyright of *PMJB* 1 to Blann.

■ The Blanns also appeal the district court's findings that they earned $19,-843.45 in profits attributable to their in-

---

**2.** A copyright will not be forfeited under § 405(a) if "(1) the notice has been omitted from no more than a relatively small number of copies ... distributed to the public; or (2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered...." 17 U.S.C. § 406(b) (1988).

fringement of Saxon's copyright of *PMJB* 1. 17 U.S.C. § 504(b) (1988). Saxon presented evidence to the district court that Blann's gross revenues from *PMJB* 1 were $37,048.41. The burden then shifted to Blann to establish "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Blann proposed to the district court that the profit attributable to *PMJB* 1 be calculated with the following formula: gross receipts of *PMJB* 1 divided by the total gross receipts of Blann's business times the total net profit of their business. This formula would have resulted in a profit of $1,426.70 allocable to the volumes of *PMJB* 1 Blann printed without a copyright notice. The district court rejected Blann's formula because it incorporated the total costs of overhead and advertising in calculating the net profit. Overhead may not be deducted from gross revenues to arrive at profits when an infringement was deliberate or willful. *See Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir.1985). The district court found that Blann deliberately omitted the copyright notice from *PMJB* 1, due to his extensive familiarity with copyright law. The Blanns argue that they did not deliberately infringe Saxon's trademark. However, the district court disagreed and its findings were not clearly erroneous. The district court deducted Blann's costs for the printing, artwork, freight and catalog advertising of *PMJB* 1, which totalled $17,204.96, from the gross revenues of *PMJB* 1. After complete review of the record, we conclude that the district court did not clearly err in its findings of Blann's profits attributable to *PMJB* 1.

## IV. CONCLUSION

We affirm.